2026 IL App (3d) 250543

Opinion filed July 7, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| WILLIAM SULLIVAN, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | La Salle County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-25-0543 |
| | ) | Circuit No. 22-LA-96 |
| ALLISON SCHIMAN; ALLY ANDERSON, | ) | |
| LLC; and RODNEY PEREZ, | ) | The Honorable |
| | ) | Jason A. Helland, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court, with opinion.
Justices Davenport and Bertani concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        This is a defamation case, but the Sullivan here is not the Sullivan from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Here, Dr. William Sullivan is a private individual who asks whether a plaintiff who proves defamation *per se* and suffers mental anguish is entitled to more than a dollar. Under these facts, the answer is yes.

¶ 2        Allison Schiman posted on Facebook—falsely—that Sullivan sexually abused her during an examination, and Rodney Perez later reposted the allegations. Following a multi-day bench trial, the circuit court agreed that Sullivan was actually (not just presumptively) harmed but awarded $1 in nominal damages. The circuit court also denied Sullivan's motion for sanctions

pursuant to Illinois Supreme Court Rule 219(b) (eff. July 1, 2002) and Rule 137 (eff. Jan. 1, 2018), based on alleged false statements by Perez in his responses to Sullivan's requests to admit. This appeal ensued.

¶ 3                                    I. BACKGROUND

¶ 4        On January 23, 2022, Schiman went to the St. Margaret's Hospital emergency room for treatment of severe abdominal pain. Sullivan, an emergency physician, performed a physical examination of Schiman. Based on the examination, Sullivan informed Schiman that he recommended performing a rectal exam to assess for the presence of blood and mucus. Schiman consented, and Sullivan performed the exam with a nurse present. Shortly after the exam, Schiman accused Sullivan of performing an unnecessary rectal exam in an aggressive manner. The next day, she filed complaints with the hospital, the Illinois Medical Board, and the Spring Valley Police Department, alleging that Sullivan sexually assaulted her during the exam. On March 25, 2022, the Bureau County State's Attorney's Office declined to file any charges and closed the case.

¶ 5        On March 31, 2022, Schiman posted the following statement (the Post) on Facebook:

"WARNING SPRING VALLEY/PERU/SURROUNDING AREAS: DR. WILLIAM SULLIVAN, an ER doctor at St. Margaret's Hospital, Spring Valley—SEXUALLUY ASSAULTED ME IN THE ER, WITH a nurse in the room. He was supposed to give me a rectal exam (I have had endless exams like this, I'm a 30 year Crohns pt) & without lube, he shoved his fingers aggressively up my rectum & when I cried out he violently twisted his hand inside of me. My rectum was torn. The nurse told me 'he didn't know you had been raped before!' When I called someone in from the hospital, they isolated me & wouldn't let my mom back. When they finally let her back, they gave her 5 min & stood with us the entire time. They then let him continue to treat me all evening. I had to do a

2

rape kit exam & police interrogation. The state [*sic*] attorneys [*sic*] office threw out charges without even speaking to me. HE HAS A MEDICAL MALPRACTICE LAW DEGREE AND A MEDICAL DEGREE. He knows EXACTLY what he can get away with. The police told me this is not his first complaint to them. Yet St. Margaret's keeps him on & defends him. DO NOT GO THERE. This man is violent & aggressive. Please don't let your loved ones near him or this hospital!!!"

¶ 6 Schiman posted the statement on the City of Peru Updates and Information Facebook page (the City of Peru Facebook page). Perez, the page's administrator, commented that he believed the post was true and compared Sullivan to another local physician who had been charged with a sex crime. Perez then made the Post a "featured post" so that it would be the first post on the Facebook page.

¶ 7 On July 11, 2022, Sullivan filed a complaint alleging defamation *per se* (counts I, II, and III), false light (counts IV, V, and VI), and intentional infliction of emotional distress (IIED) (counts VII and VIII) against Schiman (counts I, IV, and VII), Perez (counts II, V, and VIII), and Ally Anderson, LLC (Anderson LLC) (counts III and VI). Anderson LLC is a limited liability company, with Schiman listed as the sole managing member. On July 12, 2023, the court entered a default against Anderson LLC for failing to retain counsel; the default was never vacated.

¶ 8 The parties filed cross-motions for partial summary judgment. Sullivan sought summary judgment on his defamation *per se* claims, Schiman sought summary judgment on Sullivan's defamation *per se* and IIED claims, and Perez sought summary judgment on Sullivan's IIED claim. On October 28, 2024, the trial court denied Sullivan's motion and granted Schiman's motion as to Sullivan's IIED claim. On December 20, 2024, the court granted Perez's motion as to Sullivan's IIED claim against Perez.

3

¶ 9        The court held a four-day bench trial, beginning on June 2, 2025. Sullivan testified as follows. He is trained in emergency medicine and internal medicine. He has been licensed to practice medicine in Illinois since 2000. He has served as a clinical assistant professor of emergency medicine at Midwestern University since 1997 and was a clinical assistant professor of emergency medicine at the University of Chicago from 2000 to 2018. He is a past president of the Illinois College of Emergency Physicians and a past chair of the American College of Emergency Physicians, Medical/Legal Committee. He also authored several chapters in emergency medicine and frequently lectures on emergency medicine issues, both locally and nationally. Sullivan worked in the emergency room at St. Margaret's Hospital in Streator, Illinois, from 2003 to 2011. Thereafter, he worked in the emergency room at St. Margaret's Hospital in Spring Valley, Illinois.

¶ 10       On January 23, 2022, Sullivan was taking over the medical care of patients as another doctor was leaving. Sullivan learned that Schiman came to the emergency room complaining of abdominal pain. She had also visited the emergency room the previous day with a complaint of a headache. The earlier-treating physician had ordered lab work and an anti-inflammatory named Toradol.

¶ 11       According to Sullivan, when he first evaluated Schiman, she told him that she had taken Toradol that day and that she had already exceeded the maximum dose, so Sullivan cancelled the dose of Toradol. Schiman indicated her pain level was 10 out of 10. Schiman asked Sullivan what he was going to do about her pain and he stated that he was not comfortable giving her additional opiates to treat the pain. Sullivan was also uneasy prescribing opiate medication because "several things with her story weren't matching up" and the previous day she received a large dose of Dilaudid, a strong opiate.

4

¶ 12    Sullivan did a full exam of Schiman. Based on the exam and her history of colitis, he was concerned Schiman had a colitis flare-up. In light of her pain and medical history, Sullivan informed Schiman that a rectal exam was needed, and she consented to the exam.

¶ 13    Per normal procedure, Sullivan asked a nurse, Megan McNally, to be present during the exam. McNally retrieved the lubrication and gloves and set them on a tray next to Schiman's bed. Sullivan put on the gloves and lubrication and performed the exam. Sullivan indicated there was no blood on the glove, disposed of the gloves, washed his hands, and left the room.

¶ 14    After Sullivan exited the room, McNally likewise left the room and informed Sullivan that Schiman was upset because he had not asked her if she had been raped before. She also told Sullivan that Schiman made a complaint to an administrator at the hospital that the exam was aggressive and unnecessary. Schiman also requested that Sullivan stay out of her room unless absolutely necessary. Sullivan did not go back into the room.

¶ 15    Several days later, Sullivan learned that Schiman filed a complaint against him with the hospital, the Illinois Medical Board, and the police department. In March 2022, Sullivan learned that the police investigation against him was closed with no charges being filed.

¶ 16    After another few days, Sullivan learned of Schiman's post on Facebook. Sullivan was upset, withdrawn, angry, and fearful that he would lose his job at the hospital. A few days later Sullivan learned of Perez's posts regarding the incident.

¶ 17    After the Facebook posts, Sullivan had trouble sleeping, felt humiliated, and worried that patients would find out about the allegations. Sullivan stated he avoided doing pelvic and rectal exams following the allegations. Within the first two or three weeks of the post, Sullivan learned that two patients left the emergency room after learning that he was the doctor on call, but he could not state that they left because of the Facebook posts. Sullivan also did not participate in a woman's

5

rights campaign because he was concerned that Schiman and/or Perez would post something about him. Since this occurred, Sullivan has had to rebuild relationships and credibility with family, colleagues, and hospital staff. He testified that he is "not the same me." Including after the Post, Sullivan knows of patients who go to the emergency room specifically because he is there. Sullivan denied sexually assaulting Schiman.

¶ 18    McNally also testified. She stated that she is an emergency room nurse who was involved in the treatment of Schiman on January 23, 2022. On that day, Sullivan asked McNally to be a chaperone in the room while he conducted a rectal exam on Schiman. McNally set up the gloves and lubricant on an exam table and was present when Schiman consented to the rectal exam. McNally observed Sullivan put on gloves, apply lubricant, and perform the exam. During the exam Schiman did not say or do anything interpreted as a withdrawal of her consent for the exam. Schiman did not cry out in pain during the exam, and McNally did not observe Sullivan twisting his hand inside Schiman. McNally did not observe Sullivan restraining or holding down Schiman during the exam.

¶ 19    Immediately following the exam, Schiman did not complain of pain, injury, or discomfort, and McNally did not observe any signs of trauma. However, Schiman became upset after Sullivan left the room, and she informed McNally that she was upset because she was a rape victim and Sullivan did not know that or ask.

¶ 20    McNally testified that she heard about Schiman's Facebook post from other staff members at the hospital. McNally viewed as false the statements that Sullivan sexually assaulted Schiman during the rectal exam, shoved his fingers aggressively into her rectum, held her down during the exam, and violently twisted his hand inside of her. McNally also disagreed with the statement that Shiman cried out during the examination.

6

¶ 21 Michelle Sullivan, Dr. Sullivan's wife, testified that prior to January 2022, her husband was calm, bantered a lot, slept well, loved his work, and loved being a physician. Upon learning of Schiman's complaint with the police department, he became angry, frustrated, anxious, disappointed, and depressed. After learning no charges were going to be filed, Sullivan was elated. Then, after being informed of the Facebook posts, her husband was first in disbelief, followed by anger and frustration. He had difficulty sleeping and became withdrawn, moody, and depressed. He was humiliated and concerned about losing his job and future employability. She testified that he did not receive counseling or medical treatment related to the stress she observed him having.

¶ 22 Perez testified that he is not familiar with the Peru Pride Facebook group. However, Perez posts in several Facebook groups and is the administrator of the City of Peru Facebook page. In March 2022, Schiman posted the Post on the City of Peru Facebook page. Perez moved the Post into a featured post position in the Facebook group. A featured post is pinned to the top of the Facebook page. Perez commented on the Post, including in part, "As I stated, the reason for my comment is to let the dozens of people who are reporting it to be removed is so they understand that I'm aware of slander charges and that it's staying up unless I get evidence it's false. I don't believe it's false." Perez also commented, "[W]hen Dr. Perales [evidently, a local doctor involved in an inappropriate incident,] first had allegations of his malpractice people came to his rescue big time. Finally he got charged then people who defended him went silent. So far, no one has come to Sullivan's defense." Perez compared Sullivan to Dr. Perales because prosecutors had charged Dr. Perales with a crime.

¶ 23 Perez also commented that Schiman's post "reached over 15,000" viewers. Perez calculated 15,000 based on the number of groups that had posted the Post and number of members

7

in each of those groups. Perez removed the Post within 24 hours of receiving a letter from Sullivan, dated May 9, 2022, insisting that the Post be taken down.

¶ 24    Alyssa Rossman testified that she is a registered nurse who has worked with Sullivan for six or seven years. On March 30, 2022, she became aware of the Post from the Illinois Valley Scuttlebutt Facebook page. She responded to the post on Facebook that it was misinformation. She did not believe the Post, and that it did not change her opinion of Sullivan.

¶ 25    Dr. Shawn Bailey, the Director of Emergency Medicine at St. Margaret's on January 23, 2022, also testified. He stated that he did not believe the Post and that the Post did not change his opinion of Sullivan.

¶ 26    Schiman testified as well. She described Sullivan's conduct as sexual assault in the Post, based on what Sergeant Bernard Larsen told her when she filed a police report.

¶ 27    Following the completion of evidence, Schiman moved for a directed verdict. During argument on the motion for a directed verdict the trial court questioned "[H]ow do you calculate damages?" When further discussing damages, the trial court noted that the "main issue seems to be around damages *** defamation damages *** I don't even know what that looks like." Although the trial court was "certain" that mental anguish constituted compensable damages, it did not "know how to calculate that on a defamation *per se* case" and asked what the formula was for calculating damages. The trial court denied the motion for a directed verdict.

¶ 28    In its final ruling, the trial court first noted that it found this was not "a simple defamation case" and that "there were many times where I just thought wow. There's an unsettled area of law. Thanks for the guidance, Appellate Court." The trial court continued, finding that the alleged sexual assault of Schiman did not occur. The court found in Sullivan's favor on both counts of defamation *per se* against Schiman and Perez. The trial court found that Sullivan demonstrated

8

mental anguish after the Post and comments by Perez. The physical manifestations of mental anguish included inability to sleep, embarrassment, concern, changes in temperament, and changes in the way Sullivan treated patients. As for damages, the trial court found there were no job-related consequences, no loss of privileges, no issues with state licensing, no increase in medical malpractice insurance, and no effect on Sullivan's peers. In addition, the trial judge found that there was no evidence of the actual circulation size and that Facebook is not a credible news organization. Further, he stated there was "not the weight of some credible person putting" out the Post. The trial court awarded $1 in nominal damages against each defendant. The trial court also held that the claim against the corporation merged into the claim against Schiman, as it was one act.

¶ 29    Sullivan moved to modify judgment and for sanctions. Sullivan sought sanctions against Perez pursuant to Rules 219(b) and 137 for Perez's denial of five of the six requests to admit regarding the Facebook posts. Sullivan further sought to amend the amount of damages, arguing that the $1 nominal damages against each defendant was against the manifest weight of the evidence. The trial court denied both motions.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, Sullivan raises two issues. Sullivan argues that the trial court erred in awarding only $1 in nominal damages, after finding defendants liable for defamation *per se*, and in denying sanctions pursuant to Rules 219(b) and 137. No cross-appeal was filed.

¶ 32                                    A. Damages

¶ 33    We do not disturb a trial court's damages award unless it is against the manifest weight of the evidence. *Med+Plus Neck & Back Pain Center, S.C. v. Noffsinger*, 311 Ill. App. 3d 853, 856-

57 (2000). A trial court's assessment of damages is against the weight of the evidence when it ignores the evidence or uses the wrong measure of damages. *Id.* at 857.

¶ 34     A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from associating with her or him. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10 (1992) (citing Restatement (Second) of Torts § 559 (1977)). A statement is defamatory *per se* if its harm is obvious and apparent on its face. *Owen v. Carr*, 113 Ill. 2d 273, 277 (1986). In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication. *Van Horne v. Muller*, 185 Ill. 2d 299, 307 (1998) (citing *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88-89 (1996)). When words are defamatory *per se*, they are considered to be so obviously and naturally harmful to the plaintiff that the plaintiff need not plead and prove special damages. *Swick v. Liautaud*, 169 Ill. 2d 504, 518 (1996).

¶ 35     Here, the trial court found that the defendants' statements and comments constituted defamation *per se*. That finding is not contested. The trial court acknowledged that the law presumes damages for *per se* defamatory statements and further found that Sullivan suffered damages of "mental anguish." However, the trial court awarded only $1 in nominal damages against Schiman and Perez. Sullivan argues that awarding $1 in nominal damages was against the manifest weight of the evidence, in light of the trial court's finding of defamation *per se*. We agree.

¶ 36    Illinois law has long recognized that many tort injuries are intangible in nature and, therefore, resist precise economic measurement. Damages for assault, battery, false imprisonment, pain and suffering, emotional distress, disability, loss of consortium, humiliation, and reputational harm do not lend themselves to exact calculation in the same manner as contractual damages, medical expenses, or lost wages. Nevertheless, the law permits recovery for such injuries because they are often among the most real and consequential harms a plaintiff may suffer.

¶ 37    This principle is particularly evident in cases involving reputational or emotional harm. Injuries to reputation, dignity, or mental tranquility are often incapable of precise proof because their effects may manifest in subtle, personal, or long-term ways that are not readily reducible to financial records. Yet, the absence of exact measurement does not render the injury nonexistent or legally uncompensable. See *Winters v. Greeley*, 189 Ill. App. 3d 590, 598 (1989).

¶ 38    Often, when damages cannot be determined through a fixed mathematical formula, the trier of fact (here, the trial judge) has a task that more resembles art than arithmetic: translating a qualitative human injury into a monetary award that fairly and reasonably compensates the plaintiff in light of the claim asserted and the evidence presented. In making that determination, the trial judge can consider various factors, including—without limitation—the nature, extent, duration, and permanence of the injury, as well as its effect on the plaintiff's daily life, relationships, emotional well-being, and ability to engage in ordinary activities. See *Maytag Co. v. Meadows Mfg. Co.*, 45 F.2d 299, 303 (7th Cir. 1930) (listing various considerations); *Republic Tobacco, L.P. v. North Atlantic Trading Co.*, 254 F. Supp. 2d 985, 1001 (N.D. Ill. 2002) (finding that severity of the conduct factors into the consideration of the amount of presumed damages); *Durso v. Lyle Stuart, Inc.*, 33 Ill. App. 3d 300, 305 (1975) (intent to harm is a relevant factor); *Cook v. East Shore Newspapers, Inc.*, 327 Ill. App. 559, 595 (1945) (in setting general damages, a court or jury will

11

look to factors such as the breadth of publicity given to the defamatory statement, the plaintiff's prominence, the plaintiff's reputation, and the plaintiff's injured feelings and mental suffering); *cf. Fisher v. Illinois Office Supply Co.*, 130 Ill. App. 3d 996, 1001 (1984) (noting in another context that the nature and extent of injury to plaintiff's reputation, as well as mental pain and suffering, are relevant considerations). Because such harms are inherently subjective, the law necessarily entrusts substantial, but not boundless, judgment in the trier of fact. See *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002) (holding that, by necessity, a jury will have some latitude in awarding damages but it does not have *carte blanche* to do whatever it will). The ultimate question is largely whether the amount awarded bears a reasonable relationship to the evidence and the injuries. See *Winters*, 189 Ill. App. 3d at 598 (a proper award is an estimate of the extent of the loss the plaintiff has suffered in the past and would suffer in the future either from a monetary or enjoyment of life standpoint).

¶ 39 This case involves defamation *per se*, which has presumed damages. "Presumed damages are those which the law presumes must actually, proximately and necessarily result from the publication of the defamatory matter." Id. Again, these damages are inherently imprecise in connection with the harm suffered. The damages awarded are "an estimate of the extent of the loss the plaintiff has suffered in the past and would suffer in the future, either from a monetary or enjoyment of life standpoint." *Id.* Such damages are "often extremely difficult, if not impossible," for a typical plaintiff to present evidence to support a precise award of monetary damages based on the harm of the defamatory statement. *Id.* "[T]here is no scale by which to measure the monetary value of reputation, good will, loss of esteem and the like." *Id.* While absolute certainty of the amount of damages is not required, this is not to say that damages can be based on mere speculation, conjecture, hypothesis, or whim. See *id.*; see also *In re Application of Busse*, 124 Ill.

12

App. 3d 433, 438-39 (1984). Rather, the evidence "need only tend to show a basis for the computation of damages with a fair degree of probability." *Busse*, 124 Ill. App. 3d at 439; see also *Moore v. Maxey*, 152 Ill. App. 647, 650 (1910) ("there need be no direct evidence of mental suffering *** but *** it may be inferred from the nature of the injury, and that juries may, from their knowledge and experience of human nature, estimate damages which may result").

¶ 40    Here, the trial judge awarded only nominal damages, seemingly due to a lack of understanding of how reputational harm damages are assessed. Nominal damages are issued when a legal wrong has taken place but there was no actual, meaningful loss as a result of the legal wrong. See *Krejci v. Capriotti*, 16 Ill. App. 3d 245, 247 (1973). Such damages are awarded when the insignificant character of the defamatory statement leads the trier of fact to conclude that no substantial harm has been done to the plaintiff's reputation, and there is no proof that serious harm resulted from the defendant's attack on the plaintiff's character and reputation. Restatement (Second) of Torts § 620. Nominal damages serve a unique function and do not substitute for general compensatory damages, which are presumed in defamation *per se* cases. See *Gibson v. Philip Morris, Inc.*, 292 Ill. App. 3d 267, 278 (1997); *Scroggins v. Route 50 Auto Sales*, 2016 IL App (3d) 150149-U, ¶ 32 (reversing award of $1,000 in nominal damages because trial court failed to also assess general compensatory damages in a defamation *per se* matter).[1] Given that a successful defamation *per se* plaintiff is presumed to have suffered harm and need not plead or prove said harm, it is difficult for us to see how nominal damages were sufficient. See *Gibson*, 292 Ill. App. 3d at 278. We do not establish a blanket rule in this regard. Perhaps there exists a

[1]We acknowledge that *Scroggins* predates Rule 23's amendment permitting citation of unpublished cases. See Ill. S. Ct. R. 23(e) (eff. June 3, 2025). However, the prior version of Rule 23, by its plain terms, restricted parties—and not courts—from citing unpublished cases. See Ill. S. Ct. R. 23(e) (eff. Apr. 1, 2018); *Global Research Distribution, Inc. v. One Stop Mailing LLC*, 2025 IL App (3d) 240298, ¶ 27; *Byrne v. Hayes Beer Distributing Co.*, 2018 IL App (1st) 172612, ¶ 22.

defamation *per se* case in which nominal damages are sufficient. This is not that case. The law does not provide a calculator for *per se* reputational injury, but neither does it permit the court to throw up its hands and award a dollar.

¶ 41        Here, a physician was publicly accused of committing a violent sexual assault under the guise of a medical examination. Several thousand people allegedly saw the accusation. No reasonable person can describe such an allegation as trivial or inconsequential. And even though Sullivan was not required to plead or prove reputational harm because the statement was defamatory *per se*, we observe that he testified that he was humiliated following the Post. He testified, and his wife corroborated, that he suffered loss of sleep, embarrassment, concern, changes in temperament, and changes in the way he treated patients. The trial court noted this evidence in finding that Sullivan experienced mental anguish. Yet, the trial court failed to award compensatory damages for this harm, instead, awarding only nominal damages.

¶ 42        We note that Sullivan offered the trial court a formula to calculate the compensatory damages of $20 for each of the 15,000 people Perez's initial Post had reached (15,000 being based on Perez's own calculation). See *Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-63 (1985) (upholding presumed damages of $50,000 and $300,000 in punitive damages following defamatory statements); *Gibson*, 292 Ill. App. 3d at 279 (an award of $100,000 in damages for personal humiliation, mental anguish, and suffering was upheld based on evidence that plaintiff was unable to sleep, afraid he was going to be unable to provide for his family, was devastated, and was not the same person following his discharge from employment based on defamatory *per se* comments); *Brown v. Farkas*, 158 Ill. App. 3d 772, 779 (1986) (upholding $50,000 in compensatory damages following defamatory *per se* statement that plaintiff was involved in the commission of a crime caused mental anguish, humiliation, and embarrassment).

14

We take no position on whether Sullivan's suggested measure of damages is reasonable, as we conclude it is better for the trial judge to make another attempt at that determination.

¶ 43                    B. Illinois Supreme Court Rules 219(b) and 137 Violations by Perez

¶ 44        Sullivan also argues that the trial court erred in denying sanctions, pursuant to Rules 219(b) and 137, following Perez's unreasonable denial of Rule 219 requests to admit. Relatedly, Sullivan argues that Perez's defense counsel should be sanctioned pursuant to Rule 137 for submitting false denials.

¶ 45        Rule 219(b) provides:

"(b) Expenses on Refusal to Admit. If a party, after being served with a request to admit the genuineness of any document or the truth of any matters of fact, serves a sworn denial thereof, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter of fact, the requesting party may apply to the court for an order requiring the other party to pay the requesting party the reasonable expenses incurred in making the proof, including reasonable attorney's fees. Unless the court finds that there were good reasons for the denial or that the admissions sought were of no substantial importance, the order shall be made." Ill. S. Ct. R. 219(b) (eff. July 1, 2002).

¶ 46        Rule 137 provides, in relevant part:

"The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to

15

cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018).

¶ 47 On March 3, 2023, Perez responded to Sullivan's requests to admit, denying five of the six requests. Perez denied the following requests to admit: that he is "Perez Elijah Rodney" in the "Peru Pride" Facebook group; that he had no knowledge of the truth or falsity of the Post on the Peru Pride Facebook page; that he was aware of the potential damage to Sullivan's reputation if the allegations made by Schiman about Sullivan on the Peru Pride Facebook page were untrue; that he made the Post a featured post on the Peru Pride Facebook page; and that the social media posts made by Perez Elijah Rodney in the attached document (screenshots of posts by several individuals) were authentic and genuine.

¶ 48 At his October 6, 2023, deposition, Perez testified that he posts on Facebook under the name Perez Elijah Rodney. Perez also testified that he did not have knowledge of the truth or falsity of the Post at the time he answered the requests to admit but had more knowledge at the time of the deposition. Perez also admitted that he had made the Post a featured post, contrary to his response to the request to admit.

¶ 49 Following trial, Sullivan moved for sanctions against Perez and his counsel under Rules 219(b) and 137, arguing that Perez's deposition testimony demonstrated that his answers to the request to admit were false. In response, Perez argued that a request to admit that included a

16

reference to the Peru Pride Facebook group was denied because the statements were based on the Peru Pride Facebook group of which he had no knowledge of its existence nor was he a member. He also argued that he could not authenticate the genuineness of the social media posts attached to the request to admit because he had not created or provided the social posts and they had since been removed from Facebook.

¶ 50    At the hearing on the motion for sanctions, Sullivan argued that Perez's responses necessitated an unnecessary deposition of Perez. The trial court denied the motion for sanctions, finding that Perez's deposition, which was three hours long, was "very far-ranging," with a lot of issues addressed. The trial court found that sanctions were "not appropriate at this stage of the game."

¶ 51    We review the grant or denial of sanctions for abuse of discretion. *Kubicheck v. Traina*, 2013 IL App (3d) 110157, ¶ 30. An abuse of discretion occurs if the trial court fails to apply the proper law, including the proper criteria. *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006).

¶ 52    In determining whether a respondent violated Rule 219(b), the court must determine (1) if the moving party proved the genuineness of the document or the truth of the matter of fact, (2) if the nonmovant demonstrated good reasons for the denial, and (3) if the denied facts were material to the litigation. Ill. S. Ct. R. 219(b) (eff. July 1, 2002); *McGrath v. Botsford*, 405 Ill. App. 3d 781, 789 (2010).

¶ 53    We find that the trial court abused its discretion in denying sanctions because it failed to apply the criteria set forth in Rule 219(b) in making its decision. Instead, it denied the motion because Perez's deposition included more than just questions pertaining to the requests to admit and it was "not appropriate at this stage of the game." The "stage of the game," however, is not a

17

proper consideration identified in Rule 219(b).Thus, we reverse the order of the trial court denying sanctions and remand to the trial court to assess whether sanctions under Rules 219(b) and 137 are appropriate under the criteria set forth in the respective rules. We do not hold that sanctions under Rules 219(b) or Rule 137 ought to have been awarded; we are directing the trial court to reevaluate that question, based on the proper criteria set forth in the rules and caselaw.

¶ 54                                    III. CONCLUSION

¶ 55        We do not disturb the trial court's finding of defamation *per se*. However, we find that the trial court erred in awarding only nominal damages where plaintiff prevailed in establishing defamation *per se*. The law recognizes that reputational harm is difficult to measure. It does not follow that the proper response is to measure it at one dollar.

¶ 56        We also find that the trial court erred when it denied sanctions under Rules 219(b) and 137 without addressing the required criteria of those rules.

¶ 57        Nominal damages award is vacated; trial court is reversed in part. Case is remanded for entry of a damage award and with directions that the trial court reevaluate the propriety of sanctions.

¶ 58        Affirmed in part, reversed in part, and vacated in part; cause remanded with directions.

18

*Sullivan v. Schiman*, 2026 IL App (3d) 250543

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 22-LA-96; the Hon. Jason A. Helland, Judge, presiding. |
| **Attorneys for Appellant:** | William P. Sullivan, of Frankfort, appellant *pro se*. |
| **Attorneys for Appellee:** | Erin K. Russell, of The Russell Firm LLC, of Chicago, and Jonathan L.A. Phillips, of Phillips & Bathke, P.C., of Peoria, for appellees Allison Schiman and Ally Anderson LLC.<br><br>No brief filed for other appellee. |